( Decided March 2nd, 1867.)

---

JOHN SIX *vs.* JEREMIAH SHANER, MARTHA A. SHANER, THOMAS SHAW and PETER BAUMGARDNER.

HUSBAND AND WIFE; AGREEMENT AND SALE BY WIFE OF REAL ESTATE, NOT HER SEPARATE ESTATE: PLEADING IN EQUITY; NOTICE TO BONA FIDE PURCHASER: RESULTING TRUST: INJUNCTION.—J. D., a trustee in chancery, conveyed to M. A. S., a married woman, by deed, certain real estate, in terms insufficient to

Six *vs.* Shaner & Wife et al.

vest in her a sole and separate estate therein. A bill in equity filed by J. S. sought to charge said real estate with a resulting trust in his favor by reason of his having furnished M. A. S. with the sum of $850, to complete the payment of the purchase money to the trustee, J. D,, alleging that at the time of the advance of said sum, M. A. S. promised that he should be fully secured by a lien on the land, either by mortgage or in such other form as might be deemed most effectual; and that M. A. S. afterwards actually sold and conveyed to him said real estate for the sum of $3,000, crediting him with the sum of $850. The bill further alleged that the said M. A. S., with her husband, S., subsequently sold and conveyed the same property to P. B., and received in payment his promissory notes for $4,000, which notes had been assigned to one Shaw, the partner in business of the husband of M. A. S., without other than a nominal consideration, and that the said notes were yet unpaid. In addition to the other relief sought, the bill prayed for an injunction restraining P. B. from paying the said notes to Shaw, the assignee, or to M. A. S., or her husband, and restraining the said Shaw from making further assignment of said notes until further order of Court. The answer of P. B. denied all knowledge of any agreement by M. A. S. to create a lien on the said land in favor of J. S., and P. B. was not charged with such knowledge in the complainant's bill, nor was there any proof in the cause of such knowledge on his part. It was also averred in the answer of the said husband of M. A. S., that she had at one time offered to J. S. a mortgage upon the said real estate which he had refused to accept. The answers denied all charges of fraud, and there was none proved.—HELD:

1st. That except as to her separate estate, any contract by the wife, made by her alone or by her husband with or without her consent, is absolutely null and void, and she cannot be compelled to perform it.

2nd. That if this principle did not stand in the way of the complainant's claim for relief, the bill must charge the party to be affected by the decree, P. B., with notice of the contract, and the proof must sufficiently sustain the averment.

3rd. That no resulting trust is established by the facts or circumstances of the case; that it does not fall within the general principle of a purchase by one, for and with the money of another, or any of its exceptions.

4th. That there are no sufficient grounds for the injunction prayed against Shaw and P. B.; but that M. A. S. and her husband should be enjoined from assigning or transferring the said promissory notes and that said notes should be decreed to be delivered up and cancelled, to be that the bill should be dismissed except so far as it may affect the said injunction against S. and M. A. S.

APPEAL from the equity side of the Circuit Court for Frederick county.

The bill in this case, filed November 20th, 1858, by the appellant, charges that Martha Ann Shaner, a married woman and the wife of Jeremiah Shaner, purchased at

public sale, from a trustee in equity, a tract of land for $3,440.07; that this sale and purchase took place March 28th, 1857, was duly reported and finally ratified September 7th, 1857, and on the 17th of October of that year, the land was conveyed to the said Martha by the trustee, by deed duly executed and recorded; that about the 1st of May, 1857, the said Martha, not being able to raise the entire amount of the purchase money, applied, in company with her husband, to the complainant, and requested him to pay to the trustee $850, part of said purchase money, she having, as she stated, raised and paid the remainder, and your orator did accordingly pay to the said trustee the said sum of $850 on account of said purchase money; that Martha and her husband were both present at the time this payment was made, and it was then and there solemnly promised by Martha, and also by her husband, that your orator should be fully secured by a lien on the said land for the purchase money so paid by him, and should have a lien on the land for the same, and it was then and there promised by the said Martha and her husband, and each of them, that they would execute a mortgage to your orator on said land, to secure him said sum of money, so soon as the trustee should execute a deed to Martha therefor, if your orator should desire to be secured in that mode; and it was distinctly and solemnly agreed by Martha and her husband, that your orator should be secured on said land for said sum of money, in whatever form such security could be most valid and effectual. That afterwards, on the 13th of November, 1857, Martha agreed to sell the land to your orator for $3,000, and he agreed to purchase it at that price solely in order to secure said sum of $850, no part thereof having been paid or secured to him, as he did not desire to become the purchaser of the property, and was urged to do so by said Martha, who represented she had no means of paying him except by a sale of the land

to him, and that on that day he executed to her his four promissory notes for the sum of $500 each, and it was agreed that the said $850 was to be considered as paid by your orator as so much of the purchase money, and the said Martha, on that day, executed and delivered to your orator a deed for the land, a copy of which is filed with the bill, she being then about to go to the State of Illinois; that having returned in a short time, she and her husband pretending that her deed to your orator was void because her husband had not united in its execution, undertook to sell the land to one Peter Baumgardner, a brother-in-law of said Jeremiah, for $4,000, and actually conveyed the land to him by deed dated the 28th of May, 1858, and have him put in possession thereof.

The bill then charges, that at the time of this pretended sale, Baumgardner knew perfectly well both that the said sum of $850 had been paid by your orator to the trustee on account of the purchase money of said land, and that no part of it had been paid by said Martha or her husband, or either of them, except by the sale of said land to your orator by said Martha as aforesaid, and also that the land had been sold and conveyed to your orator by said Martha as aforesaid, and that the deed from her to him had, long prior to that time, been duly recorded among the land records of Frederick county.   It further charges, that Baumgardner has not paid to said Martha or her husband the entire purchase money, but gave her his notes therefor, some of which, to a much larger amount than said sum of $850 and the interest thereon, are still due from him; that after your orator found a combination had been formed between the said Jeremiah and wife and Baumgardner, to deprive him, if they possibly could do so, of the benefit of his purchase, he informed each of them he would willingly relinquish his said purchase if said Martha would surrender to him his notes for the $2,000, which are still in her

or her husband's possession, and if they, or either of them, would pay him said sum of $850 and the interest thereon ; and that he is now willing to surrender all claim to said land on these conditions.  He further states, that on the 10th of November, 1857, said Martha executed and delivered to your orator her promissory note for the $850, which through inadvertence was not delivered up to her at the time of the sale to him, and which he brings into Court to be delivered up to her on the payment to him of said sum of $850.

He further states, that he has been informed, and therefore charges, that the notes of Baumgardner to said Martha, for the purchase money of said land, not yet paid, have been by some means, by her or her husband, transferred to one Thomas Shaw, a partner in business of said Jeremiah, but that they have not been *bona fide* assigned to him for a valuable consideration, and that said Shaw well knows the aforesaid condition of said property, and of your orator's connection therewith, and what was the consideration of Baumgardner's notes, and that the said sum of $850 is wholly unsatisfied to your orator, and that he has no means of recovering the same unless it be paid him out of the said land in some form ; that Shaw has not paid to said Martha or her husband, any consideration for said notes, or if any, a mere nominal one, and that said Jeremiah is not in possession of any, or if any, of a very trifling amount of visible property ; and that said Martha is not possessed of any property whatever, except said notes, and that there are no means by which he can obtain said sum of $850, unless the land shall be sold to pay the same, or unless Baumgardner can be decreed to pay the same out of the purchase money yet due from him for the land.

The bill then charges, that said Baumgardner, Jeremiah and Martha have combined and confederated together to cheat and defraud your orator out of his money so paid

by him as aforesaid, and that Shaw has also combined and confederated with said parties to cheat and defraud your orator as aforesaid, and for the purpose of endeavoring to effectuate said fraud, has accepted the custody of Baumgardner's notes, so that he can pretend he is the *bona fide* holder thereof for a valuable consideration ; whereas, in fact and in truth, he has paid no value for the same, and holds them in trust for .the use of the said Martha and her husband, and so that Baumgardner may pretend that he is a *bona fide* purchaser and liable to said Shaw as assignee for the balance of the purchase money not paid over to said Martha or her husband.

The bill then calls for answers on oath to these allegations, and to special interrogatories fully stated, and prays that the said sum of $850 may be declared and decreed to be a lien on said land, or that your orator is entitled to a resulting use to the amount of said sum and interest thereon, and that the said land may be sold for the payment thereof, or that said Baumgardner may be decreed to pay to your orator the same out of the purchase money yet due from him for said land, and deduct the same from the amount so due by him, and that said Martha or her husband, or whichever of them has the same in possession, may be compelled to surrender the notes given by your orator to said Martha for said purchase money, to be cancelled as to your Honor may seem just ; and that said Shaw may be enjoined and restrained from assigning said notes of Baumgardner to any other person, and that Baumgardner may be enjoined and restrained from paying said notes to said Shaw, Jeremiah or Martha, or any other person, until the further order of this Court, and that said Jeremiah and Martha, and both and each of them, may be restrained from assigning or transferring the notes of your orator, given to said Martha as aforesaid, to any person or persons whatsoever, until the further order of this Court ;

and that your orator may have such further and other relief as in equity he may be entitled to.

The exhibits filed with the bill are, 1st, the deed from the trustee to Martha Ann Shaner; 2nd, the deed from said Martha to the complainants; 3rd, the deed from Shaner and wife to Baumgardner; and 4th, the note from said Martha to the complainant for $850.

The injunction was granted as prayed.

Shaw, in his answer, says he has no knowledge of the sale by Dutterar to Mrs. Shaner, the terms of it, or how she got the money to pay for the farm, except that he has heard she paid for it with the money of her husband; that he has no knowledge of the sale by her to the complainant, and of the deed by her to him, or of any transactions concerning said sale and purchase except from general rumor; and that he is entirely ignorant as to the loan of $850 by the complainant to said Martha or her husband; that he has been informed that she and her husband sold the land to Baumgardner for $4,000, and that they conveyed the same to him by the deed filed as an exhibit with the bill, which he supposed to be a fair, just and *bona fide* sale, not made with the intent to cheat or defraud the complainant or any one else, but as to the real facts he has no knowledge; that he has been informed and believes, that said Baumgardner as part of the said purchase money gave to said Jeremiah his two single bills for $1,333 33, each dated April 1st, 1858, payable to said Jeremiah at twelve and twenty-four months respectively, with interest from date; that on the 1st of July, 1858, Jeremiah offered to sell to the respondent the single bill payable at twelve months, in payment of the good will of a "Huckster's Route" called "Richard Merrings' Route," and all the horses, wagons and other property for the purpose of hauling articles to market for sale, which route and the property thereto belonging was worth $970, which sum Jeremiah agreed to

give therefor, and sold and delivered said single bill to the respondent, which sale and delivery was on the 1st of July, 1858, in payment of said good will and property, and he paid Jeremiah $100 in cash, and gave his note for the balance of the money due on said single bill ; that at the time of this purchase and delivery, the said single bill was not assigned to him in writing, and on the 5th of October, 1858, he procured a Mr. Carmack to write an assignment on the back of the bill which was signed and sealed by said Jeremiah ; that the other single bill was on the 4th of October, 1858, *bona fide* assigned under hand and seal of said Jeremiah to the respondent for a full and valuable consideration, that at the time of this assignment there had been paid on it by Baumgardner to said Jeremiah, the sum of $438.88, which was endorsed on the back of it, leaving a balance due thereon of $394 45 ; that at the time he made this last purchase he was the owner of another good will of another "Huckster's Route," called "Detrick Zeck's Route," with horses, wagons and other valuable property thereunto attached, all of great value, to wit, of the value of $1,155, which he sold and transferred to said Jeremiah for the sum of $1,155, and which property Shaner received in full satisfaction of the last bill, and the note given him for the balance due on the first bill.

He further states that before he purchased these bills, he called on Baumgardner to know whether the money due on them was justly due, and he said it was, and would be paid, and since his purchase of the last bill, Baumgardner has paid $128 thereon ; that the purchase by him of these bills was a fair, honest and *bona fide* transaction, not made to cheat or defraud the complainant, or any one else ; that the good will of said two Huckster's Routes, and the property thereto belonging and attached, was very valuable and fairly worth the sums for which they were sold to Shaner. He denies all fraud charged against him, and

says his purchase of the bills was fair and *bona fide*, and made without any intention to cheat or defraud the complainant ; that he knows nothing of the intended fraud and combination between Baumgardner and Jeremiah to cheat and defraud the complainant out of the $850, and if any such was intended by them he was no party to it, and they are responsible for their own frauds ; that he is advised these bills cannot be reached or affected in his hands, he being ignorant of any fraud, and because before he purchased them he inquired of Baumgardner whether the money was fairly due and owing, who having full knowledge of all the facts in the case in relation to the transacaction with the complainant and Shaner's wife, charged and set forth in the bill of complaint, stated the money was justly due and he would pay it.  That he is advised that if the complainant has any remedy to recover the $850, he has a complete remedy at law, and if under all the circumstances he is entitled to relief in equity, it is against the said real estate, and not against this respondent, who purchased the bills with the knowledge and consent of Baumgardner as before stated ; and he denies all and all manner of unlawful combination and fraud charged against him in the bill.

Baumgardner, in his answer says, that on the 28th of March, 1857, Mrs. Shaner did purchase the land of Dotterar, the trustee, for the sum mentioned in the bill, and she then, or soon after, paid the trustee a portion of the purchase money and gave him her notes or single bills with this respondent as her security for the balance, and the trustee then executed to her the deed for the land.  He says he does not know, nor does he believe the complainant ever paid to said trustee any portion of said purchase money, but he has been informed that he did heretofore lend said Martha $850, for which he took her promissory note, the same filed with the bill.  That on the 28th of

May, 1858, he purchased the land of said Jeremiah and Martha for $4,000, and paid the trustee the unpaid purchase money, then owing by her to the said trustee, and for the payment of which, he was security, and for the balance he executed and delivered to said Jeremiah his notes, which he has been informed and believes have since been assigned by Jeremiah or Martha to Shaw, for a good and valuable consideration ; that upon his so paying and securing said sum of $4,000, the said Jeremiah and Martha executed to him the deed for, and put him in possession of the land ; that he purchased the same truly and *bona fide,* and paid and secured the whole of said sum of $4,000, that being its full value, and at the time he made the purchase he did not know, nor does he now know or believe, that the complainant had paid any money on account of said purchase by said Martha, but believes and charges that it is a mere pretence on the part of the complainant to pretend that money lent by him to said Martha, and for which he took her note, was so paid, hoping thereby by some means fraudulently to obtain it of this respondent ; that he did not know that it had been agreed by Jeremiah or Martha, or either of them, that the complainant should have a lien on the land for any money ; that he did not know whether the money mentioned had been paid or not to the complainant; that he did not know whether Jeremiah or Martha were in possession of the notes mentioned in the bill or not ; that he has not declared before said purchase, that he would pay the complainant the said sum of $850 and interest ; that he has not declared that the complainant might and should lose said money ; that he does not know of his own knowledge, but has been informed and believes, that said notes of this defendant were transferred by said Jeremiah and Martha, or one of them to said Shaw for a good and valuable consideration ; this defendant knows said notes were transferred to said Shaw, and has been

informed and believes for a good and valuable consideration ; that the said Jeremiah is his brother-in-law ; that his purchase of said land was a *bona fide* purchase for a valuable consideration, he having paid and secured to be paid $4,000 for the same, and that he was induced and obliged to make said purchase to save himself from great loss and danger which he would otherwise have sustained as security for said Martha, to said trustee, for the purchase money of the land ; and he denies all and all manner of unlawful combination and confederacy wherewith he is charged in the bill.

Jeremiah Shaner in his answer says, his wife did purchase the land at the time, for the sum, and from the trustee, as stated in the bill, and that she paid a portion of the purchase money in cash, and gave her notes to the trustee with Baumgardner as her security for the residue, and at the time of said payment, the trustee executed to her the deed for the property ; that he, this defendant, acting for and on behalf of his said wife, paid said purchase money to the trustee ; that a portion of said cash payment so made by said Martha, she had borrowed of complainant, for which she gave him her note, as complainant has informed this defendant, and that it was agreed between Martha, respondent and complainant, that the two former should execute a mortgage to the latter to secure him for said money, and in pursuance of this agreement, he and said Martha did execute a mortgage prepared by Joseph Davis, an attorney at law, and tendered the same to complainant, who for some reason refused to receive it. That complainant did not pay said sum of $850 to Dotterar, or any part of said purchase money, but respondent himself paid said purchase money, and it was not agreed or understood that complainant should have any lien on said land otherwise than as before stated. That defendant was in possession of the land from the date of the purchase by his

wife, till they sold it to Baumgardner; that some time in November, 1857, he was absent from home in Baltimore, and on his return, he found that during his absence, his wife had left her home, and removed to Illinois, having been taken from her home in his absence, as he believes and charges, to the city of Frederick, by the complainant, who furnished her with money barely sufficient to carry her to Illinois, (which was repaid to him by respondent,) having, by some means to defendant unknown, induced her to execute the deed for the land filed with the bill, for which he gave her his two notes for $2,000, retaining her note for the $850, which defendant is informed by the bill was to be deducted from said $2,000, and the difference remitted to said Martha in Illinois. That he at once denounced said conveyance as illegal and fraudulent, and declared to complainant he would have nothing to do with it; and he now charges said deed was obtained by him of said Martha by improper and fraudulent practices, with intent to cheat and defraud said Martha and this respondent. That after hearing of the desertion or abduction of his wife as aforesaid, he followed her at great expense to Illinois, whence she returned with him to her home on said land, and that afterwards they sold the land to Baumgardner for $4,000, and after deducting from that sum the money paid by Baumgardner on the former purchase of the land by said Martha from Dotterar, and for which he was security, he gave his notes for the balance, which notes were assigned to Shaw for a valuable consideration.

He further says, that at the time said money was borrowed, and ever since, he has owned and possessed a large amount of property, much more than sufficient to pay any sum complainant could possibly recover of him, and he has desired complainant to bring his action against him, in order that their respective rights might be duly determined in a Court of Law, and he has now an action pending

against him in the Circuit Court for Carroll county, brought by complainant, as he has been informed, for the recovery of said sum of $850. He further says, that complainant did not pay to Dotterar, the trustee, the sum of $850, in part of the purchase money of said land, and that it was not at any time agreed between complainant and said Martha, and this defendant, that complainant should have any other security or lien on said land than a mortgage for money lent to said Martha ; and he denies all and all manner of unlawful combination and confederacy wherewith he is charged by the bill.

Mrs. Shaner failed to answer, and an interlocutory decree was obtained against her, a commission was issued and testimony taken.

Josiah Dotterar, the trustee, says, "he sold the land to Mrs. Shaner on the 28th of March, 1857 ; that Six loaned her $850 between the 1st and 10th of May, 1857, to pay me part of the purchase money ; the money was loaned at the request of her and her husband for her use ; they said at the time they procured the money, they would give Six a mortgage or lien on the land to secure his said loan of $850. Baumgardner is now in possession of the land, but I don't know how he got into possession." On cross-examination he says, "I was present when Six loaned the $850 to Shaner and wife, and no joint note was given by them for the money at that time ; they were to give Six a mortgage on the property as soon as I made a deed for it to Mrs. Shaner ; Six paid $850 of the note given for the last payment on the property to Mrs. Shaner. She shoved the money to her husband, he counted it and paid it over to me, and I put it in my pocket ; this was done in my house ; after this payment there was still a balance of about $60 due on the note, which Mrs. Shaner paid to me and I delivered up the note to her."

Samuel Fuss says, he knows Mrs. Shaner bought the

land from Dotterar about the last of March, 1857. In the latter part of. December, 1857, Baumgardner and myself, sureties on a note for Jeremiah Shaner, were sued and a judgment obtained against us, and we went to Westminster and paid it, and were then going to sell this land to get our money out of it; on our way home, we were talking of this matter and Baumgardner said, I believe I will buy the property from Jeremiah and his wife; he said he would do so to save trouble and cost to Shaner, and to save our money out of it. I asked him what Six would do about the $850 which he had paid to Shaner and wife, (I do not remember which of the parties were spoken of,) in the property, and he said he would have to do as he had done, fight it through. Baumgardner is now in possession of the land, he bought it from Shaner and wife and went into possession a few days after the conversation I have just detailed. Baumgardner had knowledge that Six had advanced or loaned part of the purchase money paid by Mrs. Shaner to the trustee for the land, before his purchase of it, and so stated in the conversation I have before detailed.

*Abraham Shorb* says, Mrs. Shaner purchased the land from Dotterar some time in March, 1857; Mrs. Shaner and her husband said to me that Six had loaned them $850 to make the last payment on the land; I heard Baumgardner several times say, he thought Six was foolish for putting the $850 in the place without any lien or security; sometimes he would say Six ought to have his money, and sometimes he did not see how he was to get it; he said he was security for Mrs. Shaner on the note to Dotterar, the trustee, for the last payment of the purchase money on the property, and that Six was a very clever fellow for borrowing money and paying his, Baumgardner's, debts, and he would not care if Six would pay some more for him; these conversations took place before Baumgardner bought the place from Mrs. Shaner; I lived with him at the time.

He is now in possession of the land, and went into possession in the fall of 1857. I know that Baumgardner, at the time he purchased the land, had knowledge that Six had advanced or loaned part of the purchase money paid by Mrs. Shaner to the trustee for it, and I have frequently heard him say so, as I have before detailed.

*George Merring* says, Baumgardner stated to me before he bought the farm, that "he knew Six had paid $850 for Mrs. Shaner on account of the purchase money due the trustee therefor; he said at the time he was going to buy the farm that he intended to retain $850; he said he intended to buy the farm, and I told him he might be too fast in buying and paying the Shaners for it, and he said in reply, that he would retain in his own hands $350 so as to make himself safe."

The Court below (NELSON, J.,) passed a decree dismissing the bill, from which the complainant appealed.

The cause was argued before BOWIE, C. J., and BARTOL, GOLDSBOROUGH and WEISEL, J.

*Wm. P. Maulsby* and *O. Miller* for the appellant.

1st. This land was purchased by a married woman under the *sanction of a Court of Equity,* and the officer of that Court executed a deed to her conveying the land to her, her heirs and assigns forever; under these circumstances, and the purchase having been made after the passage of the Act of 1853, ch. 245, the second section of which declared that it should "not be necessary to interpose a trustee in order to secure to a married woman the sole and separate use of her property;" Mrs. Shaner is to be regarded as holding this land to her sole and separate use. She had, therefore, the power to charge this land with her agreements or contracts, and the party with whom she contracts can enforce in equity such contracts against her separate

estate, provided the agreement on its face shows the intent to charge the estate, or if there is evidence *aliunde* proving such intent. Here there is evidence, express and overwhelming, of the intent of Mrs. Shaner to charge this land thus purchased and conveyed to her with the payment of this claim of the appellant. *Cooke vs Husbands*, 11 *Md. Rep.*, 492. *Chew vs. Beall*, 13 *Md Rep.*, 348. *Koontz vs Nabb*, 16 *Md. Rep.*, 549. *Gray vs. Cook,* 12 *G. & J.*, 236. *Conn vs. Conn*, 1 *Md. Ch. Dec.*, 212. *Price & Nesbitt vs. Bigham* 7 *H. & J.*, 296. *Tiernan vs. Poor*, 1 *G. & J.*, 216. *Brundige vs. Poor*, 2 *G. & J.*, 1. *Deale vs. Ins. Co*, 18 *Md. Rep*, 26.

2nd. Though it may be true as a general proposition, as in *Clabaugh vs. Byerly*, 7 *Gill*, 362, that a mere parol agreement to execute a mortgage, when denied by the mortgagor, cannot be enforced in equity because of the Statute of Frauds, yet it is equally clear, that such an agreement, when confessed by the answer or when part performed, is taken out of the operation of the statute, and will be enforced against the party making it, and all those claiming under him who have actual notice, or could be presumed to have notice thereof. Here the agreement to execute a mortgage is not only confessed by Jeremiah Shaner in his answer, but he says, such a mortgage was in fact prepared in writing, but for some reason was not accepted. The proof also shows, that the purchaser, Baumgardner, had notice of all the matters connected with the purchase of this land fully sufficient to put him on inquiry as to whether such an agreement existed or not. The proof also shows that a gross fraud would be allowed to be perpetrated if the relief here sought should be refused. *Clabaugh vs. Byerly*, 7 *Gill*, 362. 1 *Sug. Vend.*, 155. 3 *Powell on Mort.*, 1050, *a*. *Worley vs. Walling*, 1 *H. & J.*, 208. *Crane vs. Gough*, 4 *Md. Rep.*, 316. *Winn & Ross vs. Albert*, 2 *Md. Ch. Dec.*, 169.

3rd. The complainant is also entitled to relief upon the ground of an implied or resulting trust, having furnished his money as part paym nt of the purchase money for the land. *Hill on Trustees,* 91, 96, 97. 2 *Story's Eq.,* sec. 1202, *et seq.*

*Jos. M. Palmer* for the appellees.

1st. The charges in the complainant's bill do not very clearly and distinctly disclose the real relief he seeks. The prayer of the bill is certainly very multifarious in its character, and it is the duty of the appellant to define the real object he has in view, to enable this Court to extend to him any relief. The Circuit Court dismissed his bill, because it did not appear from the charges in the bill, and the evidence in the case, that he was entitled to any relief, and it is insisted that the judgment of the Circuit Court was correct. If the complainant has any right or claim in the case, which he can enforce against anybody, or in any Court, it is for the payment of the sum of eight hundred and fifty dollars, which he claims to have loaned or advanced to Jeremiah Shaner and his wife, about the 1st of May, 1857, and the interest due thereon.

We will assume then, after a careful examination of all the facts and circumstances of the case, that the real object of the appellant is to recover the sum of $850, and interest thereon, from somebody, without much regard from whom, or the means used to obtain it.

It is a trite saying, that "all persons who come into a Court of Equity, seeking equity, must come with clean hands, untarnished and unsoiled with iniquity of any kind, and with a case fair, just and equitable in all its parts, and free from fraud of any kind." This is a sound common sense rule of equity, never to be departed from. *Stoddard et al. vs. Bowie,* 5 *Md. Rep.,* 18.

Can it be said that this complainant came into the Court

of Equity seeking its aid, "with hands untarnished and perfectly clean? with a case just, fair and equitable in all its parts?" I think not. His own account, as averred in his bill, of his conduct with Mrs. Shaner in November, 1857, while she was on her way to a distant State, in the absence and out of the presence of her husband, without a friend or protector to guard her rights, must certainly awaken the suspicions of the Court that some fraud and unfairness was intended.

The answer of Jeremiah Shaner, the husband, one of the defendants, in response to that statement in the bill, is a fair exposition of the motives of appellant. His object was sordid speculation, not justice. He never had claimed or demanded of Shaner and wife the execution of said pretended parol agreement, to execute the mortgage to secure the eight hundred and fifty dollars. That was not what he wanted. He wanted to obtain the land at half its real value. That was his motive, as is clearly disclosed by the record in the case.

But, it is said, the appellant is justly entitled to recover the $850, &c., which he loaned and advanced to Shaner and wife; but the question is, how is he to obtain it? Certainly not in this Court as a Court of Equity, for he has no standing in a Court of Equity, from his own showing.

He had, and now has, a full, complete and adequate remedy at law against Jeremiah Shaner, if he has not lost it by his negligence and fraudulent conduct. Whether or not he has lost his remedy at law, is not now for this Court to decide. The money was loaned or advanced to Jeremiah Shaner and wife, they were both present at the time, he acquiesced in and sanctioned the loan, and the advancement of the money, and promised to secure it by a mortgage, and was clearly liable at law for its payment. Dotterar, himself, proves this fact, and it is a fact in this case which cannot be denied. But the contract on the part of the wife

was utterly null and void, both in a Court of Law and in a Court of Equity.

It is a well settled principle in this State that all the contracts of a married woman, as a general rule, are void and not binding. She cannot convey her property unless by virtue of some special law, authorizing her to do so. All other contracts of a *feme covert* are null and void, as well at law as in equity, and she cannot be compelled to perform them, except for property which she holds for her separate use and benefit, free from her husband's marital rights. *Burton et al. vs. Marshall,* 4 *Gill,* 493. *Norris vs. Lantz & Hyde,* 18 *Md. Rep.,* 260. Judge COCHRAN in delivering the opinion of the Court, uses the following strong language, "Except in regard to the separate property of a *feme covert,* all her covenants, contracts and agreements in Courts of Law as well as of equity, are absolutely null and void, and she is under no obligation, and cannot be compelled to perform them, whether entered into by herself or on her behalf by her husband without his consent." The property in that case belonged to Mrs. Hyde, but was subject to the marital rights of the husband, and was not the separate property of the wife.

In this case, Martha Ann Shaner had no property which she held for her separate use and benefit, free from the marital rights of her husband, and she never had, so far as the record in the case discloses any such fact.

The question, as to whether the appellant had a full, complete and adequate remedy at law against Jeremiah Shaner for the eight hundred and fifty dollars, can hardly be a debateable question in this State. *Crane vs. Gough,* 4 *Md. Rep.,* 317. *Oliver vs. Palmer & Hamilton,* 11 *G. & J.,* 448. "The constant incroachments of the jurisdiction of the Courts of Equity ought to be resisted, because it is a jurisdiction confessedly inferior to the Courts of Common Law jurisdiction." *Richardson vs. Stillinger,* 12 *G. & J.,*

480. Special causes for the inadequacy of the legal remedy are not to be presumed, but must be proved by the complainant. 7 *G. & J.*, 118. 2 *H. & J.*, 68. 1 *Bailey's Equity Rep.*, 62. No case can be found in any book of authority in which equity has jurisdiction over a mere moneyed claim, for the recovery of a certain and specific sum of money.

2nd. The counsel for the appellant have submitted to the Court three legal propositions to show that the judgment of the Circuit Court, in dismissing complainant's bill, was erroneous, and ought to be reversed. I contend that neither proposition can be sustained, by authority, upon the facts and circumstances of the case. The first point is, that the real estate in question, which Martha Ann Shaner purchased of Josiah Dotterar, and by him conveyed to her, is an estate for her separate use, free from the marital rights of her husband, and chargeable with the payment of the eight hundred and fifty dollars, loaned and advanced to Jeremiah Shaner and wife jointly. There are no facts in the case to sustain such a proposition. The law upon the subject is very clear and well settled, as appears from the authorities cited by the learned counsel, but they have no application to the case under consideration.

The facts in this case do not show that Martha Ann Shaner, at the time of the joint contract with her husband for the loan and advancement of the eight hundred and fifty dollars, did own any property for her sole and separate use, independent of her husband's marital rights, or that she ever held or owned any such property.

If the complainant cannot show clearly and indisputably that the real estate in question was her sole and separate property, free from the marital rights of the husband, there is nothing upon which this Court, as a Court of Equity, can act. The contracts of a married woman, as a general rule, are void and not binding upon her person-

ally, either in law or equity ; but such contracts are binding upon her property which she owns and holds for her separate use and benefit, if it clearly appears from the evidence in the case, that when she made the agreement, she had reference to her separate estate, and intended to charge it by the contract, and provided the contract be of such a nature as to bind her individually in equity. This is the settled law of this State. It is admitted, that so far as her separate property is concerned, if she have any, she is considered as a *feme sole.*

But Martha Ann Shaner had no property for her separate use and benefit, at least it does not so appear from the facts in the record of this case. Notwithstanding, the appellant's counsel insist, that the land purchased by Martha Ann Shaner of Dotterar became the sole and separate property of the said Martha Ann, free from the marital rights of the husband, and liable to be charged with the eight hundred and fifty dollars.

That question depends entirely upon the terms and legal construction of the deed under which she holds the property.

If it was intended that the grantee should have a sole and separate estate, free from the marital rights of her husband, it should have been so expressed and provided for in the deed, in language clear, certain and unequivocal, so as to free the question of all possible doubt. This is the language of all the authorities on the subject.

Such a claim or right on the part of a married woman, being against the common right, the instrument under which it is created must clearly speak the donor's intention to bar the husband, else it cannot be allowed. *Clancy on the Rights of Married Women*, 262, 263.'' It is not sufficient that there be a gift for the wife's benefit, or a direction to pay the money into her own hands, for there is nothing in this inconsistent with the marital rights. But there must

be a direction that it shall be for her sole, separate and independent use, or in other equivalent terms, showing a manifest intention to exclude the husband." *Taylor vs. Lake*, 2 *Russ. & Myl.*, 183 to 187. 2 *Story's Eq.*, secs. 1381 and 1382. *Hill on Trustees*, 420, 421, and cases referred to. The question frequently arises, what words are sufficiently expressive to create such a purpose? for the purpose must clearly appear beyond any reasonable doubt, otherwise the husband will retain his ordinary legal and marital rights over the property. 5 *Ves.*, 517. 3 *Ves.*, 166. 9 *Ves.*, 370, 377. *Wills vs. Sayers*, 4 *Madd. Rep.*, 401. *Massey vs. Parker*, 2 *Mylne & Keen*, 174. *Lewis vs. Adams*, 6 *Leigh*, 320. *Carroll vs. Lee*, 3 *G. & J.*, 505. *Cooke vs. Husbands*, 11 *Md. Rep.*, 504.

It has been long settled in England and in this State, that a married woman can hold and own a separate estate without the intervention of trustees; that the husband will be treated in equity as a trustee for the separate benefit of his wife. 3 *G. & J.*, 505. 11 *Md. Rep.*, 504. 2 *P. Wms. R.*, 316. 9 *Ves.*, 583. 3 *Brown's Ch. Ca.*, 383. 9 *Paige*, 364. *Hill on Trustees*, 406.

This was the law before the Act of 1853, ch. 245.

It seems to be very clearly settled by the authorities, as applied to the facts in the case, that Mrs. Shaner, at the time of the contract for the loan of the $850, had no property for her separate use and benefit upon which this Court can act, for if the Court can act at all, it must be by proceeding in *rem.*, it is the separate property that the Court of Equity can fasten upon, not the person. But we will suppose for a moment that Mrs. Shaner did own the property in question as her sole and separate estate, the appellant has no standing in this Court from his own showing, for indeed he has a complete remedy without the aid of this Court as a Court of Equity.

The law is well settled, and indeed it is admitted law,

that a married woman as regards her separate property, is to all intents and purposes a *feme sole*, with full power to sell and dispose of at her will and pleasure, all her separate property. Mrs. Shaner exercised this right and power by selling and conveying the real estate in question to the appellant himself, which deed of conveyance was recorded and a copy of which forms a part of the proceedings in this case, having been filed by the appellant as a part of his claim.

What more can the appellant want? According to the theory of his counsel, he has got the very thing that from the beginning he has been seeking to obtain.

Let the appellant bring his action of ejectment and try his title, and that will test the question as to the true character of the deed from Dotterar to Mrs. Shaner, and whether she took an estate for her sole and separate use, free from the marital rights of her husband.

It is not charged in complainant's bill, that Mrs. Shaner, at the time she entered into the joint agreement or contract with her husband to borrow eight hundred and fifty dollars of appellant, owned any property for her separate use and benefit, and if it was so charged, there is not a particle of evidence in the record to prove it. But suppose the property in question was her separate property, as contended for, there is no evidence in the case that the appellant has any debt or claim against Mrs. Shaner which can properly be charged upon her separate estate, upon equitable principles, even if she owned separate estate.

The counsel for the appellant, to sustain their first point, have referred to sundry Maryland decisions. The correctness of these decisions is not questioned. They certainly present a fair exposition of the law on this subject, but they do not sustain the proposition of the learned counsel, they strongly tend the other way, as it will be found after a careful examination of them.

*Koontz vs. Nabb,* 16 *Md. Rep.*, 549, is a case in which an attempt was made to enforce a debt of a married woman against her sole and separate property, and the Court decreed against the complainant upon a sound and clearly defined principle, that is, "a married woman having a separate estate, cannot affect that separate estate, unless the obligation sought to be enforced present upon its face some evidence of the intent to charge the estate, or there be evidence *aliunde* tending to prove such intent." The opinion of the Court in that case was prepared with great ability, and with legal accuracy and precision. The case of *Koontz vs. Nabb,* is strongly fortified by 11 *Md Rep.*, 492. 1 *Md. Ch. Rep.*, 212. 7 *H. & J.*, 296. 12 *G. & J.*, 236.

These cases all teach us that two facts must appear to the Court to be clearly and positively proved, before a Court of Equity will lend its aid to take the sole and separate estate of a married woman to pay her debts.

1st. It must be positively proved by legal and proper evidence, that the property sought to be taken is, in truth, the sole and separate property of the married woman.

2nd. The debt or contract attempted to be enforced against the separate estate of a married woman, must have been made and entered into by her with a clear intent that it should be binding upon her separate estate, and that the claimant has no remedy at law to recover the money he seeks to charge on such separate estate.

The question, whether the real property in question was the sole and separate property of Mrs. Shaner, depends entirely upon the terms and wording of the deed of Dotterar to her.

There is another insuperable objection to the appellant's claim for relief. The complainant does not charge in his bill, specifically, what debt or claim he seeks to charge upon the separate estate of Mrs. Shaner, which should have

been done to entitle him to relief. The Court is not informed from anything in the record, what particular debt is claimed as a charge on the pretended separate estate. Is it the note for $850, executed by Mrs. Shaner the 10th of November, 1857, that is claimed as a charge upon her separate estate? If so, the claim cannot be sustained, for there is no evidence to show for what the note was given, or the intention of Mrs. Shaner in giving it, and there is nothing upon the face of the note to show any intention, &c. The case of *Koontz vs. Nabb*, settles this question. Is it, then, the contract of May, 1857, entered into by Shaner and wife jointly, with the appellant, for the loan of eight hundred and fifty dollars, that is sought to be charged on Mrs. Shaner's separate estate, because the appellant has no remedy at law? If that be the claim, the appellant cannot have any standing in this Court. Mrs. Shaner's separate property is not, upon any principle, to be charged with that debt. That was the contract of Jeremiah Shaner, and he was responsible for the money, and the appellant had a full, complete and adequate remedy at law for its recovery. The contract on the part of the wife was null and void.

I am satisfied that no case can be found in any book of authority, where the separate property of a married woman has been charged in a Court of Equity with the payment of a debt or claim created by joint contract of husband and wife, unless it be in a case where the husband is proved to be utterly insolvent, and the wife entered into the contract with the intention to bind her separate estate on that account. In this case, Jeremiah Shaner has always admitted his liability and willingness to pay, and his ability to pay is not questioned, and cannot be.

It would indeed be a very hard case if Baumgardner should be deprived of his property, for which he paid its full value, under such circumstances.

3rd. The second proposition of the appellant cannot be sustained, for the real question involved in it was decided in the case of *Clabaugh vs. Birely*, 7 *Gill*, 362. That case is in fact and principle very much like this. In that case the Court' decided that a mere parol agreement to execute a mortgage could not be enforced in a Court of Equity because of the Statute of Frauds. That certainly cannot now be considered a debateable question in this State, or anywhere else where the "Statute of Frauds" is in force. The learned counsel on the other side, however, admits the correctness of the principle as a general proposition, but he contends that there are exceptions to it, and that this case forms an exception to the general rule. He contends that if the parol agreement is confessed or admitted by the defendant in his answer, or where there is a part performance of the parol contract, that takes the case out of the operation of the Statute of Frauds. That as a general rule is correct, but there is nothing in this case to give the rule any application. There is another general principle equally as sound, which must govern this case, that is, "the answer of one defendant in a case shall not be read in evidence against another defendant." *Gresley Ev.*, 29, (*note.*) *Jones vs. Torbervell*, 2 *Ves. Jur.*, 11. 4 *Brown Ch. Ca.*, 115. *Morse vs. Royal*, 12 *Ves.*, 361. 1 *Greenlf. Ev.*, sec. 177. 1 *Gallison*, 630. 6 *Cranch*, 153, 156. 4 *H. & J.*, 518. *Sanders vs. Allen*, 2 *Molloy*, 329.

The appellant's counsel say, that Jeremiah Shaner, one of the defendants, in his answer, admitted the parol contract to give the mortgage. Suppose he did admit the agreement to execute the mortgage, that cannot have any effect upon the rights of Mrs. Shaner and Baumgardner, and it cannot be used in evidence against them for any purpose. They have not admitted the parol agreement, or any other agreement to execute a mortgage. The real object of the appellant is to reach the said real property in

the possession of Baumgardner, a *bona fide* purchaser, without notice to him of any such agreement or contract on the part of Shaner and wife to execute a mortgage.

The bill does not charge that Baumgardner, at the time he purchased the property, had notice of any agreement or contract, that Shaner and wife had agreed to execute a mortgage to the appellant to secure the payment of the sum of $850 on the property in question, and if there were such a charge of notice in the bill, there is no evidence in the record to prove it. Baumgardner is charged with notice that the appellant had loaned or advanced to Shaner and wife eight hundred and fifty dollars to pay the last payment for said land, she having paid the first payment in some way, and Baumgardner the second payment as her security. But it is not charged he had notice of the contract for a mortgage. The appellant has an insurmountable difficulty to contend with in this case. The pretended contract by Shaner and wife with the appellant, to execute a mortgage on the property to secure the said sum of eight hundred and fifty dollars, for two reasons, was utterly null and void : 1st, it was void, being by parol, under the Statute of Frauds ; second, because all contracts, of married women, as a general rule, are void. The true principle to be extracted from all the cases is this : "The agreement of a *"feme covert"* with the consent of her husband for the sale of her real estate, is absolutely void at law, and a Court of Equity will never enforce such a contract against her. 2 *Kent's Com.*, 168, 170. 2 *Story's Equity*, secs. 733 to 736. *Emery vs. Ware*, 8 *Ves.*, 814. *Davis vs. Jones*, 4 *Bos. & Pul.*, 207. *Jannes vs. Jackson*, 16 *Ves.*, 367. *Martin vs. Mitchell*, 2 *Jacobs & Walker*, 425.

In the case, 2 *Jac. & Walker*, the Master of the Rolls uses this strong language : "The acts of a married woman with respect of her estate are perfectly void, she has, as said by the Master of the Rolls, in *Wright vs. Raller*, 2

*Ves.*, 676, no disposing power, though she may have a dis= posing mind. This agreement signed by her with her husband cannot affect her estate, and cannot give the party a right to call upon her in a Court of Equity to execute a conveyance to bar her, if she survives, and to bind her in- heritance." This is the settled law upon the subject. The appellant has not a shadow of claim either against Mrs. Shaner or Baumgardner. In a case where a *feme covert* owns real estate for her separate and sole use, with power to sell and dispose of it, the law is different. Jeremiah Shaner was unquestionably bound for the said eight hun- dred and fifty dollars, but not in a Court of Equity.

4th. The third proposition of the appellant is certainly one not very easily solved, as applied to this case. The counsel say that the "complainant is also entitled to relief upon the ground of an implied or resulting trust, having furnished his money as part payment of the purchase money for the land." The authorities referred to, to sus- tain the proposition, are not denied, but the proposition itself, as applied to this case, is new and novel, and I dare not risk any comment upon it, not having heard any lucid explanation of it by the learned counsel on the other side. There certainly is not one fact in the case to justify any such proposition, so far as I understand the record. *Hill on Trustees*, 92, 95, 97, *and cases there cited.*

WEISEL, J., delivered the opinion of this Court.

The deed by Josiah Dotterer to Martha Ann Shaner, exhibited with the bill in this case, was executed on the 17th of October, 1857, and without any terms to constitute the real estate therein conveyed, her sole and separate estate, she being a *feme covert*. The Acts of Assembly of 1842, ch. 293, and 1853, ch. 245, which govern this case, did not invest her with a separate estate in the property so as to exclude the marital rights of the husband. This con-

struction has been distinctly and repeatedly settled by this Court. *Schindel vs. Schindel*, 12 *Md. Rep.*, 122, 312, 313. *Bridges & Woods vs. McKenna*, 14 *Md. Rep.*, 266. *Mut. Ins. Co. vs. Deale*, 18 *Md. Rep.*, 47. *Weems vs. Weems*, 19 *Md. Rep.*, 345.

Such being the nature of her title, no question can arise as to her power to affect or charge it by any contract or agreement of her own. It is only in regard to the *separate property* of a *feme covert* that she can make a contract that equity would recognize and enforce. 4 *Gill*, 487. 18 *Md. Rep.*, 269.

But the object of the bill, as shown by its frame-work and the proof taken to support it, is to charge the property with a resulting trust in favor of the appellant, by reason of his supplying $850 to Mrs. Shaner to complete the purchase money due by her to Dotterer, or with an equitable mortgage based on the parol promise and agreement of Mrs. Shaner and her husband, when he paid the $850, that he should be fully secured by a lien on the land, either by mortgage or in some other form, as might be deemed most effectual. Such is the averment of the bill, and one of the prayers is, that the said sum may be declared and decreed to be a lien on the said land, or a resulting trust in favor of the appellant.

It was conceded, and cannot be denied, that a mere parol agreement to execute a mortgage of real estate, cannot be enforced in equity because of the Statute of Frauds. But it was insisted, that when such an agreement is confessed by the answer, or has been performed in part, it is taken out of the operation of the statute, and will be enforced against the party making it, and all those claiming under him who had actual notice, or could be presumed to have notice of it, and that the answer of Shaner and the proof in the cause, are sufficient to place this case within the exception to the rule.

The authorities before cited upon the subject of contracts by *femes covert*, establish the principle, that except as to her separate estate, any contract by the wife, made by her or by her husband, with or without her consent, is absolutely null and void, and she cannot be compelled to perform it. This principle, however, is to yield to any statutory mode for enabling married women to contract, or to bind or bar their interests in real estate. *Morris vs. Harris*, 9 *Gill*, 28. *Johns vs. Reardon*, 11 *Md. Rep.*, 470.

Even if this principle did not stand in the way of the appellant's claim to relief, the bill must charge the party to be affected by the decree with notice of the contract, and the proof must sufficiently sustain the averment.

The bill in this case, while it charges Baumgardner (the purchaser of the land from Shaner and wife,) with knowledge of the loan to or payment for them of the $850, does not aver his knowledge of the alleged agreement to mortgage or give a lien on the land to secure its re-payment. Nor does the proof establish such knowledge in him, and his answer expressly denies it. The witnesses (and they were all produced on the part of the complainant, Six,) testify as to Baumgardner's knowledge of the loan, but none of them prove that he knew of the alleged promise to give a lien. What was deposed to by Fuss and Merring conveys a mere suspicion of such knowledge on his part, while Shorb's testimony proves the want of it. It is also to be noted that none of the interrogatories to which the witnesses deposed, specifically elicited their knowledge on this particular point of the investigation.

We do not think that any resulting trust is established by the facts or circumstances of this case. It does not fall within the general principle of a purchase by one for and with the money of another, or any of its exceptions. It is the case of a loan of a sum of money to a vendee in her own name and for her own purposes and use, to eke

Six *vs.* Shaner & Wife et al.

out a balance due on the purchase, with a promise or under the expectation of being secured. The mode in which he sought the security by a purchase of the land himself from the wife alone, under the circumstances adverted to in the proceedings, and his alleged refusal to accept a mortgage when tendered, do not place him in a favorable attitude in a Court of Equity.

The answers deny all fraud and combination charged in the bill against the several defendants, and there is no proof of any.

The decree below simply dismissed the bill with costs, without noticing the several injunctions in the case. Those against Shaw and Baumgardner should be dissolved, but that against Jeremiah Shaner and Martha Ann Shaner to restrain them from assigning or transferring the four promissory notes for $500 each, given on the 10th day of November, 1857, by the appellant to said Martha Ann, as alleged in the bill, should be made perpetual, and the said notes should be decreed to be delivered to the said appellant to be cancelled. The appellees should however be allowed their costs. We will affirm the decree below dismissing the bill, except so far as it may affect the said injunction against Shaner and wife, and the relief prayed against them for the delivery up and cancellation of said notes. That should be made perpetual, and the bill retained for these purposes ; the other injunctions to be dissolved. We will sign a decree accordingly.

> *Decree affirmed in part,*
> *and reversed in part.*